argued, the first of which is Scott Specht v. The City of New York, 20-4211-CB. I think we may have lost Judge Newman. You sure? You're back now when you talked, yeah. Yeah. You were going, I think it's fine now, thank you. Yeah, I think it's, the voice is fine and the video is slow, but not totally frozen. I think we can proceed. Mr. Nathaniel Smith is with us for the appellant, Specht. Yes, Your Honor, here. Go ahead. Oh, may I proceed? Please. Thank you. Thank you, Your Honors. And I appreciate, I know it's a COVID problem, but I appreciate the opportunity to actually appear in this form as opposed to telephonic. I think it improves the process and it certainly gives me a sense as an advocate of an opportunity to do my job. Thank you. I think the issue here in this case is a Garcetti issue. The question is whether or not the lower court properly applied the Garcetti analysis to find that all of the categories of speech that were asserted by Scott Specht were in fact unprotected conduct. And in reviewing all the cases and the briefs, I'm confident that there is no case that I'm aware of that extends Garcetti as far as this case. And I respectfully submit for that reason that the court should reverse. And I say that primarily because there are decisions from the circuit that are very clear that certain acts are not within or pursuant to the official duties of a government officer. And in particular, the event that triggered this case was a direction by supervisors to Specht to file a false report assigning blame for a fire, a deadly fire to a boiler, when in fact that was just not the case. And the Jackler case squarely holds that nobody is required to file a false report that constitutes a criminal act. And that it makes no sense under a Garcetti analysis to suggest that filing a false report could possibly be something that a government officer could do pursuant to a government officer's sworn obligations to uphold the law. And so I think under the Jackler analysis, the initial refusal by Specht to file a false report is protected conduct. And then, unfortunately for Mr. Specht, the retaliation accelerated ultimately with him leaving, but he went outside the chain of command. He reported his concerns about official misconduct to DOI and to the DA. And again, I'm not aware of any case that holds that Garcetti could possibly apply to a situation like that unless the person, the official, as part of his or her regular duties reports to those outside agencies. I think there was a case, Anteome, that was cited by the appellees where you had a former chief of the NYPD who went and started working for MTA and he had regular reporting duties to the DA. And so the court, I think there properly held that that was speech that was part of his regular duties. There's no basis for suggesting in this record that Scott Specht, who was a fire marshal, had any responsibilities for reporting to other law enforcement agencies. And so I do not see a basis for suggesting that those acts, which are far, far afield of an internal discussion among employees or supervisors at a government office. So I don't see there's any strong basis at all. In fact, I think that to apply Garcetti to those forms of outside speech would effectively eviscerate or eliminate all First Amendment rights for public employees, which of course is not the law. So I think if you analyze the facts as alleged, you'll see that the lower court I submit was wrong in its Garcetti analysis. And then it also was equally wrong in its public concern analysis by saying that reporting misconduct and reporting concerns about the proper investigation of fires, in this case a deadly fire that destroyed a building. Those are issues that are of extreme public concern. And in addition, in this case, the fire and the cause of the fire was closely followed by the media, which is another indication that this was a matter of extreme public concern. And then since filing my brief, the city council enacted legislation specifically because of this fire, making reporting requirements, imposing reporting requirements on the movie industry for precisely the reasons suspect was concerned about, shutting off sprinklers, having toxic materials inside a facility. So I respectfully submit to the court that Speck not only was not speaking pursuant to his duties, but he was clearly speaking about matters of public concern to the public. I have a minute. I'd like to just talk with you briefly about the state whistleblower claim. The research that I've done has uncovered no case that suggests that the grievance process that was laid out in the collective bargaining agreement here provided Speck with a final and binding arbitration avenue that he failed to pursue. The collective bargaining agreement provision here specifically says that you can bring a grievance if you're making a complaint arising out of a breach of the collective bargaining agreement or an existing policy or regulation. And Speck is not making any claims about the CBA or about, you know, violating public, I mean, government employee policies. He's making a first amendment retaliation claim and a whistleblower claim. And so he didn't have any available remedy to him. And the remedy, if it was available, was not available to him. It was available to the union. Thank you. Thank you, Mr. Smith. You are reserved three minutes. Yes, thank you. Good afternoon, Your Honor. For Appellees, the core of Mr. Speck's first amendment retaliation claim here does fall right in the heart of Garcetti. And Garcetti was a situation where an assistant district attorney wrote a report recommending a dismissal of a case because, in his view, a search warrant contains serious misrepresentations. He quarreled with his superiors over that, apparently, according to the recitation of the case. In the Supreme Court's decision, there was a heated dispute over that, and he was instructed to change the report. And he also then later actually also testified at a traverse hearing in an attempt to suppress related to the search warrant. So in both cases, it involves someone's core duties. Here, Mr. Speck is having a difference of opinion with his supervisors as to an investigation into a particular fire, which is- Well, first, counsel, excuse me. To the extent you rely on what Garcetti said about the report, isn't it true that in the Garcetti case, the employee conceded that the report was not a First Amendment material? No, I believe in Garcetti, what was conceded was that the report was done pursuant to his official duty. So that was not- Well, that's the other side of the coin. It was done pursuant to his duties and therefore was not First Amendment protected, right? Right. But the report sort of doing an investigation and a report summarizing the results of your investigation is a core responsibility of a fire marshal. That's not disputed here, Your Honor. Well, in any event, that report, it was conceded that it wasn't protected, and it was a report to his supervisor, correct? In Garcetti. In Garcetti, I believe it was a report to his supervisor. I don't know if he conceded that- Did Mr. Speck limit his speech to his supervisors? He did not, and that's why I wanted to start with his court claim. All right. So since he went far beyond his supervisors and reported to the district attorney and to the other investigative agency, how does Garcetti help us at all? Well, I think Garcetti, as I said, Your Honor, I think Garcetti created the report that clearly governs what the core of his first-time retaliation claim here, which is the email, which is the dispute he had with his superiors. And then it also covers the email that he sent to his fellow fire marshal. His complaint is not limited to a different- I understand that, Your Honor. You asked me how- I'm sorry. His complaint is not limited, as I read it, to a dispute with his employer about the cause. His claim has to do with reporting what he understands as corruption to an outside investigative authority. That's correct. That is an aspect of it, but that sort of- Not only is it an aspect, it's what distinguishes Garcetti, is it not? It partially distinguishes Garcetti, Your Honor, and I apologize. Your earlier, I think, question to me says, how does Garcetti help us at all? I think it clearly governs the internal communications and the alleged retaliation based on his defiance or disagreement, however you want to characterize it, with his supervisors. Because it's very much on all fours with Garcetti, because Garcetti had a district attorney saying, I don't- Oh, all right. If you're just invoking Garcetti to the extent that there's a dispute about the cause, that's one thing. Tell us why reporting to a district attorney that there is corruption in a department is not- Sure, I think there's an attempt to sort of cobble together an additional claims here that don't really hold up. We cited four cases in, I think, four or five cases in our brief, where this court has found that going outside the chain of command and taking it to an outside agency doesn't necessarily transform it into protective citizen speech. And those are all cases that were decided post-Garcetti, I think, that this court did. But, Mr. Popolo, wouldn't you agree that post-Garcetti, we've made it perfectly clear, perfectly clear that, quote, exposure of official misconduct is generally a great consequence to the public? That's in Jackler. And also in Galander, we said essentially the same thing, that matters implicate the public interest when the plaintiff sought relief against misconduct by a public agency or public officials. How do you get around this precedent? Well, I certainly can, I think, explain why Jackler doesn't control here. And also, I would point out that what Your Honor was just reciting, I think, goes more to the public concern prong, which we do make that argument. But I think our primary argument here, and what I want to focus on, is the citizen versus employee. In Jackler, there's definitely tension, I think, between Jackler and Garcetti. And I think the way you can resolve is in Jackler, you were talking about someone who's a recipient witness, who had witnessed what was brought as an allegation of excessive force, made a sworn statement about what he had seen, and was told to retract that statement and submit a false statement. That's no different from Speck. That's exactly what Speck did. I respectfully disagree, Your Honor. In Speck, there's no allegation that he was told to falsify any facts. He doesn't make any allegations about, you know, I submitted, I drafted it, and I had these facts and said, you have to change it. I made a sworn statement that I observed X, Y, or Z, and you now have to say I didn't see that. That's a little facile. He said that his employers, his supervisors, leaned on him to falsify the cause of this fire. Well, to falsely report the cause of the fire. And he took that matter outside of the fire department, to the DOI and to the district attorney. He uses falsify a lot in an extent. Well, but I'm saying falsify, he acknowledges, he pleads that there were two potential theories, and that he did not think that this theory was the one that, in his judgment, the theory about the boiler room flu was not, in his judgment, theory that was, in his judgment, the cause or at least the primary cause is that he was told to falsify any factual information. And he was told to push or advocate for a cause of the fire, which he didn't believe was the cause of the fire, in order to save the city and the department from embarrassment and potential loss of funds from movie business. That's what he says. I mean, I think as the district court pointed out, those allegations are purely speculative. They're not even an inference from something else than claims. Well, how are they speculative? You've got, he also alleges that his superior gave the boiler in question to the movie people or to the agents of the movie people. That's pretty specific allocation. That's not speculation. But he does, that's correct, your honor. And he does make another allegation. Well, isn't that some basis? I mean, the district judge thought the cover-up was speculative. But when you undergird the so-called speculation with giving the boiler to the very people who he says started this fire or caused it to either start or accelerate, isn't that a lot more than speculation? Possibly. But even if you accept that that's a fair inference from that, the motive, it doesn't change the fact that he still wasn't, you had his, it's still within Garcetti because in Garcetti, he was told he was overruled with respect to his view that there were misrepresentations in a search warrant. But again, that's a guy who reported to his supervisor. And Parker points out that this man reported to outside authority. So let's focus on that. All right.  Was he speaking as a citizen or an employee? Does anything in his employment regulations or contract or CBA oblige him to report to a district attorney when he sees corruption? Not that I'm aware of, Your Honor. Now, this district judge in dismissing this case said, didn't he say, or words to the effect, he was an employee because he was just doing what his duty required. I can't remember whether that's the case or not. I think that in any event, can we agree what he was doing here was more than his duty? He seems to indicate in his pleadings that he felt that he had some sort of public, he had a duty as a public employee and his sworn obligation, the oath he took to bring this to. I don't read it that way. I read it when he says he had a duty, he was talking about his citizen duty. I don't think he says anywhere that as an employee, he was required to report to a district attorney. If you can find that, tell me where it is. I believe Your Honor is correct there. Oh, okay. And finally, finally in Crown, we said specifically a firefighter's criticism of a fire department for deficiencies in training, discipline, and morale of protected matters of public concern. I mean, well, here he is, this is an opinion of our court, which strikes me as quite close to the actual, to this case we're dealing with. Would you, do you disagree? Well, I think this case is much more specific to, he's trying to remedy what he believes was unfair action taken against him because he didn't endorse and he wouldn't come to, he wouldn't adopt a position that he disagreed with in the course of his employment. But because it's that sort of specific judgmental issue, it's not the same as a broad-based criticism of a policy or something like that, that might be more akin to the court's decision Your Honor just mentioned, also the Matthews case. Would you agree that what he told the district attorney was a matter of public concern? Well, we don't. His pleading about what he told the district attorney was extremely vague, and there's no allegation the district did anything in response to it. Do you understand that what he told the district attorney is that he thought the city, that the fire department supervisors were covering up the true cause of the fire in order to protect the city's reputation for promoting the movie industry? Is that what he told the DA? I don't know that you can make that necessary inference from the vague allegations in the complaint. What do you think he told the DA? We don't know, he hasn't pleaded. We do know that there's certainly no indication, he doesn't think that the DA did anything in response, and there's no allegation that the defendants who allegedly retaliated against him were even aware that he had made this statement to the district attorney or to the Department of Investigation. Thank you. May I briefly address the state whistleblower claim? Well, your time has expired, but why don't you take a minute and wrap it up? Of course, your honor. The relevant language of the collective bargaining agreement is that a grievance applies to a claim violation, misinterpretation, or inequitable application of policy regulations affecting the terms and conditions of employment. And that's exactly what he is alleging here. The fact that he also has a First Amendment claim, a First Amendment retaliation claim, doesn't change that. I mean, he claims that placing him on modified duty constituted disciplinary and adverse personal action regarding his employment as a fire marshal. It's at page 54 of the joint appendix. He claims the modification was done in violation of established employment procedures at the FDNY. And it caused him to lose valuable employment and pension benefits. So that is something that needs to be grieved under the collective bargaining agreement. And he had an opportunity. There are four levels of the grievance process. Levels one through three can be initiated by a fire marshal. It's only level four that can be initiated. That has to be the arbitration that has to be initiated by the union. But the state law cases slated in our brief are clear that that qualifies. And that when you fail to go through that grievance procedure, you fail to exhaust your remedies. And you do not have a viable, for that procedural reason, you do not have a viable state law whistleblower claim under the civil service law. Thank you, Your Honor. Thanks very much. Mr. Smith is reserved three minutes. I don't think, given the court's questions and answering some of the questions that I had, that I need three minutes. On the state whistleblower claim, the collective bargaining agreement is very clear. If you have a gripe about a contract provision, or if you have a gripe about a specific regulation, then you have an arbitration remedy. And that remedy is a remedy given to the union. The statutory provision that the lower court relied upon says that if the person, the plaintiff has that available remedy, and they fail to pursue it, then they effectively have lost their right to go into state court or federal court with a state cause of action. Speck did not have that right. And he's not asserting any violations of any rules or regulations in this case. So I don't think there's any question here. If the legislature of the state of New York wants to make a clear statement that says that no employee who has a collective bargaining agreement can bring a whistleblower claim, then they really must say that. They haven't said that. And I cited a district court decision by Verdi, specifically on this point, because it narrows in on this very precise issue, which is that, yes, there can be a waiver and a loss of important rights, but you need to have a specific hat to hang yourself on if you're going to find a waiver. And there is none here. I will be very brief. Garcetti was a very limited case. And your honor was correct. It was in that case, if the decision specifically talks about how it was undisputed that the memo written by the prosecutor, the assistant district attorney in Garcetti's office was acting pursuant to his official duties and the court there answered the question, well, what do we have now? Speck was not writing a memo to his supervisors. The closest you come in this case is the email that he sent, not to his supervisors, but to his colleagues, where he was imploring them to hold on to their personal integrity because of the pressure that he was just put under. That was not even that was pursuant to his official duties. He'd already been removed from the investigation. He had reported sick. And he was no longer acting as a fire marshal when he wrote that email to his colleagues. So even if the case was just that, and it's clearly not, if that's even that is not a Garcetti question. And I thank again the court for giving me the opportunity to appear by Zoom. It's much better than a telephone. I appreciate that. Thank you. Thank you. It's a pleasure to have heard each of you. We thank you for your argument and we'll reserve decisions.